# In the United States Court of Federal Claims

No. 09-271C
(Filed: September 17, 2009)*
*OPINION ORIGINALLY FILED UNDER SEAL ON AUGUST 31, 2009

```
* * * * * * * * * * * * * * * * * *   *
                                      *
UNISYS CORPORATION,                   *
                                      *
              Plaintiff,              *   Bid Protest; FAR Part 8 - Blanket
                                      *   Purchase Agreement; Motion to
          v.                          *   Dismiss - Challenge to Terms of
                                      *   Solicitation Barred Under Blue &
THE UNITED STATES,                    *   Gold Fleet v. United States, 492 F.3d
                                      *   1308 (Fed. Cir. 2007); Motions for
          Defendant,                  *   Judgment on the Administrative
                                      *   Record; Discussions Under FAR Part
LOCKHEED MARTIN                       *   8 Were Not "Unfair"; Technical
CORPORATION,                          *   Evaluations Supported by the
                                      *   Administrative Record.
          Defendant-Intervenor.       *
                                      *
* * * * * * * * * * * * * * * * * *   *
```

Richard J. Webber, Washington, DC, for plaintiff. Lisa K. Miller, Washington, DC, and Anne H. Warner, Reston, VA, of counsel.

Scott T. Palmer, U.S. Department of Justice, Washington, DC, with whom were Tony West, Assistant Attorney General, and Jeanne E. Davidson, Director, for defendant. Marie Cochran, General Services Administration, Washington, DC, of counsel.

Marcia G. Madsen, Washington, DC, for Defendant-Intervenor, Lockheed Martin Corporation. David F. Dowd, Roger D. Waldron, and Polly A. Myers, Washington, DC, of counsel.

**O P I N I O N**

FIRESTONE, Judge.

This case comes before the court on the cross-motions for judgment on the administrative record filed pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") by the plaintiff, Unisys Corporation ("Unisys" or "the plaintiff"), the defendant, the United States ("the government" or "the defendant") and the defendant-intervenor, Lockheed Martin Corporation ("Lockheed," "Lockheed Martin," or "the intervenor").  Additionally, Lockheed has filed a motion to dismiss Count I and the "price-related" portions of Counts II and III of the plaintiff's complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.  The government supports Lockheed's motion to dismiss.

The plaintiff currently provides information technology services to the Federal Acquisition Service's Chief Information Officer at the General Services Administration ("GSA").  In this bid protest action, Unisys is challenging GSA's award of a new five-year blanket purchase agreement ("BPA") for these services to Lockheed.  The estimated value of the BPA (assuming all option periods are exercised) is $400 million.

For the reasons stated below, Lockheed's motion to dismiss is **GRANTED**.  The government's and Lockheed's motions for judgment on the administrative record with regard to Unisys's remaining claims are both **GRANTED**.  The plaintiff's motion for judgment on the administrative record is **DENIED**.

## BACKGROUND FACTS

The following background facts are taken from the administrative record.

## I.     The Request for Quotations

On November 11, 2008, GSA issued Request for Quote ("RFQ") No. GS-TFMG-BPA-09-001, using GSA Federal Supply Schedule ("FSS") ordering procedures, seeking to establish a BPA for contractor services to support, maintain and enhance certain GSA internal information technology applications.  The procurement is described as the Federal Acquisition Service ("FAS") Applications, Maintenance and Enhancements ("FAME") BPA.  FAME provides support services for operations and maintenance, modernization, and enhancement of FAS information systems.  These information systems provide the infrastructure for FAS's government contracting programs, including the FSS program, Government-Wide Acquisition Contracts, and assisted acquisition services. Administrative Record ("AR") 1367-1668.

This procurement was an FSS procurement, subject to FAR 8.4,[1] rather than a negotiated procurement subject to FAR Part 15.  As such, the RFQ was issued to only those contractors that had a previously established FSS 70 contract.[2]  AR 1370.  The RFQ

---

[1]FAR 8.4 establishes the policies and procedures for the placement of task and delivery orders and the establishment of BPAs by federal agencies under the FSS program.  48 C.F.R. §§ 8.401 to 8.406-6 (2005).  As discussed in detail below, FAR Part 15 does not apply to task and delivery orders or BPAs issued under FAR 8.4.  See FAR 8.404(a) ("[FAR] Parts 13 (except 13.202(c)(3)), 14, 15, and 19 . . . do not apply to BPAs and orders placed against [FSS] contracts. . . ." (emphasis added).  48 C.F.R. § 8.404 (2005).

[2]The FSS program, also known as the Multiple Award Schedule program, is managed by GSA and provides federal agencies with a simplified process for obtaining commercial supplies and services at prices associated with volume buying.  See FAR 8.402, 48 C.F.R. § 8.402 (2005). FSS 70 is GSA's information technology schedule.

GSA negotiates FSS contracts in accordance with GSA Regulations ("GSAR").  In accordance with GSAR 538.270, GSA negotiates fair and reasonable pricing for FSS contracts

3

stated that award would be made to an offeror whose quotes provided the best value to the government, price and other factors considered, unless otherwise specified in the RFQ. AR 1144. As noted above, the estimated total value of the BPA (assuming all option periods are exercised) is $400 million over a one-year base period and four one-year option periods. AR 1372. The RFQ sought quotations, not competitive proposals.

The RFQ instructed offerors to submit quotes in three parts: (i) a "Written Cost/Price Quote" ("Part I"); (ii) a "Written Technical Quote" ("Part II"); and (iii) an "Oral Technical Quote Presentation" ("Part III"). AR 1467. Part I comprised the offeror's price proposal, and Parts II and III comprised the offerors' technical proposals. Id.

As part of the technical proposals, the RFQ directed offerors to submit responses to four sample task orders, which were to include the technical approach for accomplishing the sample task requirements, the staffing approach for each sample task, and the key personnel for each sample task. AR 1469. It advised contractors that the sample task would be used for evaluation purposes and stated that the "evaluation criteria contained in

---

based on each offeror's commercial practices and policies. As FAR 8.404(d) notes, the FSS contract prices and labor rates have already been determined fair and reasonable by GSA. 48 C.F.R. § 8.404(d).

FSS 70 contracts have been explained as follows:

[FSS] 70 is a particular multiple award schedule under GSA's [FSS] program that lists numerous vendors providing a variety of [information technology ("IT")] products and services to the government. A vendor's IT services are listed for a period of time on [FSS] 70 through individual schedule contracts with GSA. The labor categories offered by individual vendors are set forth in a price list incorporated into each vendor's schedule contract.

Data Mgmt. Servs. Joint Venture v. United States, 78 Fed. Cl. 366, 368-69 (2007).

this BPA (Section 12) will be used to evaluate Sample Task Responses." Id.

The RFQ indicated that GSA would evaluate both portions of each technical proposal based upon the following three factors: Key Personnel and Staffing Approach, Technical Approach, and Management Approach. Id. at 1475. The RFQ stated that the first two factors were of equal importance, while the third was of less importance. Id. It further stated that the three technical factors were significantly more important than cost. Id.

RFQ Section 11.2(c) stated, "The Government may make award based on initial offers received, without discussion of such offers. Quotes shall set forth full, accurate, and complete information as required by the solicitation package (including attachments)." AR 1134. RFQ Section 11.2 did not specifically reference or incorporate FAR Part 15.

RFQ Section 11.7(b) instructed contractors submitting a quote to indicate the price to be charged for all labor categories outlined in RFQ Section 1.3.2 commensurate with its GSA pricing as discounted on the BPA. AR 1137. RFQ Section 11.7(c) instructed offerors to "prepare one summary schedule . . . which provides the labor categories and rates commensurate with its GSA pricing and the GSA pricing of any teaming partners to include any discounts proposed for the purpose of the BPA." Id. It also stated that "[t]he information requested in the quote is required to enable the Government to perform a price analysis." AR 1137. RFQ Section 11.7 is discussed in greater detail below.

RFQ Section 12 set forth the evaluation criteria for use in awarding the BPA. RFQ

Section 12.2 addressed the Price Quote Evaluation.  AR 1144-45.  It stated that

> [a] determination of price realism and reasonableness will include a determination by the [Contracting Officer ("CO")] that proper discounts have been offered commensurate with maximum order thresholds for prime contractors and teaming partners and in accordance with subcontractor arrangements.  The Government reserves the right to reject any proposal that includes any assumption or condition that impacts or affects the Government's requirements. . . .

> Evaluation of Pricing shall be based upon the proposed single, minimum "team" discount (expressed as a percentage) which shall be applicable to all labor categories, labor rates, and support products contained in the awarded BPA SINs of each team member's GSA Schedule Contract.  For price evaluation purposes, the Government will simply compare the minimum "team" discount percentage proposed, and will not apply the proposed discount to any of the underlying labor rates/support products contained in any of the proposed GSA Schedule contracts.  Given this analysis, a team percentage discount of 10% will be evaluated more favorably than a discount of 5%, regardless of the underlying labor rates and/or support product prices resident in the proposed GSA Schedule contracts.

Id. (emphasis added throughout).

## II.   Question and Answer Exchange

After issuing the RFQ, the government held a question and answer exchange

with the offerors, the results of which were incorporated into Amendment II to the RFQ.

Unisys submitted the following question regarding GSA's method of evaluating

price:

> Evaluation of pricing based on the team discount without applying the discount to any of the underlying labor rates/products does not appear to offer best value to the buyer, GSA.  For example[,] if contractor A has a program manager rate of $200 per hour and offers a 15% discount, the price to the buyer would be $170 per hour.  If contractor B has a program manager rate of $100 per hour and offers a 10% discount, the price to the buyer would be $90 per hour, a

> much better deal for the buyer.  However, evaluating only based on the discount
> rate would mean contractor A is evaluated higher than contractor B.  Applying
> the discount rate to the labor rates and products and evaluating the cost at that
> point would appear to give a truer picture of the best value to the buyer.  Please
> comment.

AR 1157; Compl. ¶ 21.  In response, the government wrote, "The rates by labor category

are not consistent across the schedules.  The Government will maintain the current

wording of the solicitation."  Id. (emphasis added).

**III.   Receipt and Evaluation of Quotations and Award of the BPA**

On February 10, 2009, Unisys, Lockheed, and [redacted] submitted written quotes in

response to the RFQ.  These were the only three companies to respond.  In these

submissions, the offerors proposed the following discounts: [redacted] – [redacted]%,

Unisys – [redacted]%, and Lockheed Martin – [redacted]%.  AR 3270.

A.   Technical Evaluation

GSA's Technical Evaluation Board ("TEB") evaluated the offerors' technical

proposals from February 10 through February 20, 2009.  AR 2356.  The summary results

of the technical evaluation were as follows:

| CRITERIA | [redacted] | Unisys | Lockheed Martin |
|---|---|---|---|
| Key Personnel and Project Staffing Approach | [redacted] | Excellent | Excellent |
| Technical Approach | [redacted] | Good | Excellent |
| Management Approach | [redacted] | Good | Excellent |
| Overall Rating: | [redacted] | Good | Excellent |

AR 3269.  A detailed description in support of these adjectival ratings is located in the

TEB Consensus Report ("Consensus Report").  AR 2361-2403.  The court shall address

the ratings at issue in this protest in detail below.

B.     Price Evaluation

GSA evaluated pricing based on the proposed single "team" discount (expressed as

a percentage) applicable to all labor categories and labor rates in the awarded BPA.  AR

3270.  This is the method that was identified in RFQ Section 12.2.  AR 1145.  In an

evaluation entitled "Cost/Price Analysis and Price Negotiation Memorandum," the CO

stated, "In accordance with FAR 8.404(d), GSA has already determined the prices of

supplies and fixed price services as fair and reasonable; therefore, ordering activity is

responsible for considering the level of effort and the mix of labor proposed to perform a

specific task being ordered."  AR 3270.  The CO went on to state:

> As stated above, the pricing provided in GSA Schedule Contracts is already
> determined to be fair and reasonable.  Evaluation of pricing at the BPA level
> is based upon a proposed single, minimum "team" discount (expressed as a
> percentage) which is to be applicable to all labor categories, labor rates, [sic]
> contained in the awarded BPA [Special Item Numbers] of each team member's
> GSA Schedule contract.  For price evaluation purposes, the Government
> compared the minimum "team" discount percentage proposed, and did not
> apply the proposed discount to any of the underlying labor rates/support
> products contained in any of the proposed GSA Schedule contracts.
> Considering this analysis, as referenced in [RFQ] Section 12.2, (Price Quote
> Evaluation) of the BPA[,] a team percentage discount of 10% was evaluated
> more favorably than a discount of 5%, etc.[ ] regardless of the underlying labor
> rates and/or support product prices resident in the proposed GSA Schedule
> contracts.

AR 3270 (emphasis added).  With regard to the successful offeror, Lockheed, the CO

wrote that "[t]he comparison between proposed discounts to pre-existing GSA Schedule rates, which will apply to all subsequent . . . orders under this BPA and also across all option years of the BPA, demonstrates that option pricing proposed by [the] successful offeror, Lockheed Martin[,] is fair and reasonable." Id. The CO also noted that because the government had set a Not to Exceed ceiling price, the successful offeror was obligated to charge no more than this estimated price. Id.

In their quotations, Unisys provided an estimated total price of $396,202,273, AR 5169-71, and Lockheed provided an estimated total price of $398,332,157, AR 13702-03. However, pursuant to the terms of the RFQ, GSA compared only the percentage discounts each offeror proposed and not the prices resulting from the application of these discounts. AR 3270.

C.    Pre-Award Discussions With Lockheed

Between March 4, 2009 and March 11, 2009, after the receipt of all quotations and the conclusion of all oral presentations but prior to the award of the BPA, GSA conducted two rounds of discussions with Lockheed.[3] AR 3273-77. Among the subjects under discussion was an assumption Lockheed had included in its quote that no greater than

---

[3]It is noted that Unisys refers to these communications as "discussions," see, e.g., Ptf.'s Mot. JAR at 20, while the government terms them "exchanges," see, e.g., Def.'s Mot. JAR at 18, and Lockheed calls them "communications," see, e.g., Lockheed's Mot. JAR at 29, through which GSA sought "clarification and/or verification from Lockheed Martin regarding certain assumptions contained in Lockheed['s] quote," id. at 15. The court also notes that the Cost/Price Analysis referred to them as "negotiations." AR 3273. While this distinction might have been relevant if FAR Part 15's limitations on such discussions or exchanges applied, for the reasons explained below, such is not the case for procurements conducted under FAR 8.4. Therefore, this court will simply refer to them as "discussions" for ease of reference.

[redacted] of its employees would be located off-site. AR 3273. [Redacted]. Id. As a result of those discussions, Lockheed proposed two discount rates: [redacted]. AR 3277. GSA also asked Lockheed to address some other questions. However, Unisys's objections to the discussions with Lockheed focus on [redacted], and on GSA's request for a reduced rate overall. GSA did not conduct any discussions with Unisys.

D.    Best Value Determination And Award

After evaluating the three offers it received, GSA determined that due to its superior technical evaluation and its larger proposed discounts, Lockheed's proposal provided the best value to the government. AR 3278. In regard to the best value determination, the Cost/Price Analysis states:

> The solicitation provided that all non-price evaluation factors are significantly more important than cost and price. The Lockheed Martin proposal provided the largest minimum team discount beating the second largest proposed minimum discount [Unisys's] by a margin of [redacted]%. Furthermore, the Lockheed Martin [proposal] was the only proposal to receive an overall score of "Excellent," receiving a score of "Excellent" for every single evaluation factor. The [redacted] and Unisys proposals provided lesser minimum team discounts of [redacted]% and [redacted]% respectively. The technical ratings for [redacted] and Unisys were also lower than the Lockheed Martin overall rating of "Excellent," with overall ratings of "Acceptable" and "Good" respectively. Given Lockheed's superior technical proposal and greater minimum discount, the Lockheed Martin proposal clearly represents the best value to the Government.

AR 3278 (emphasis added throughout). The CO provided the following award decision:

> The [CO] has reviewed the evaluation assessments of the Technical Evaluation Board and determined the evaluation was based on the criteria identified in the TOR. The Technical Evaluation Board rated Lockheed Martin's proposal overall as "Excellent[."] The price analysis demonstrated that the proposed

10

price is fair and reasonable based on adequate price competition. [The c]ost realism [analysis] was performed by using cost analysis techniques on the proposed level of effort and labor mix against the sample task orders provided in the RFQ. Lockheed Martin clearly proposed a more integrated technical and management solution and provided future innovations that will provide value to the Government. Accepting a lesser quality proposal for an additional price provides both a performance and cost risk to the Government. Based on the aforementioned, the [CO] determines that the Lockheed Martin <u>initial</u> proposal . . . represents the best value to the Government. Through the aforementioned negotiations, the Government was able to receive additional discounts. The final proposal, dated March 11, 2009, at a total evaluated minimum discount percentage of [redacted] is recommended for award.

AR 3278 (emphasis added). Accordingly, on March 19, 2009, GSA awarded the BPA to Lockheed. AR 9473.

     E.    <u>Unisys's GAO Protests</u>

On March 30, 2009, Unisys filed a protest at the GAO regarding the award to Lockheed. AR 24. In that protest, Unisys argued that GSA illegally failed to consider which quote would provide the overall lowest net cost to the government. AR 29-30. On April 7, 2009, GSA responded to Unisys's protest by arguing that it was untimely under GAO bid protest regulation 4 C.F.R. § 21.2(a)(1) (2005). <u>Id.</u> That regulation requires, in relevant part, that protests based upon an apparent impropriety in a solicitation shall be filed prior to the time set for receipt of the initial proposals. AR 20. GSA noted that Unisys failed to protest the method of cost/price evaluation disclosed in the solicitation prior to the time set for receipt of quotations. <u>Id.</u> On April 21, 2009, the GAO held that Unisys's protest was, in fact, untimely because Unisys did not challenge the alleged impropriety in the solicitation with regard to evaluating price. AR 14. The GAO noted

11

that Unisys's question to the agency regarding its intended method of evaluation "evidence[d] an unambiguous understanding of the price evaluation methodology prior to the date quotations were to be submitted." AR 16. The GAO concluded: "[t]hus, to be timely, Unisys's protest had to be filed prior to the deadline for submitting quotes; since Unisys did not file its protest until after award, the protest is untimely and we will not consider it." Id.

After having received a debriefing from GSA regarding its quote and filing its initial GAO protest, Unisys filed a supplemental protest. In the supplemental protest, Unisys challenged certain aspects of GSA's technical evaluations of both Unisys's and Lockheed's quotes. AR 65. Because Unisys filed a protest in this court shortly thereafter, GSA did not respond to those claims during the GAO protest, nor did the GAO rule on those claims.

F.    The Present Action

In the present action, Unisys, the government, and Lockheed have filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1. Additionally, Lockheed has filed a motion to dismiss the price-related portions of Unisys's complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The government supports Lockheed's motion to dismiss.

1.    Cross-Motions for Judgment on the Administrative Record

Unisys argues that it is entitled to judgment based on the administrative record for

several reasons.  First, it claims that GSA violated the terms of the RFQ and acted

arbitrarily and capriciously when it failed to consider the offerors' actual prices in making

its award decision.  Second, it argues that GSA "violated the terms of its RFQ and

applicable law, and acted arbitrarily and capriciously, when it held discussions only with

Lockheed and allowed Lockheed in those discussions to make an unacceptable proposal

acceptable."  Ptf.'s Mot. JAR at 2.  Finally, it argues that GSA's evaluation of proposals

for the non-price factors was arbitrary and capricious.  Id.

As concerns the price evaluations, Unisys argues that "[b]ecause only percentage

discounts were used, as a false surrogate for price, an award to the best value offeror could

only have happened by chance."  Id.  Unisys asserts that the actual net price that it offered,

measured in dollars, was lower than that offered by Lockheed.  While Lockheed offered a

higher percentage discount than that offered by Unisys, Unisys asserts that this higher

discount still yielded a higher net price because Lockheed's underlying FSS 70 rates were

higher than those of Unisys.  Unisys claims that "[b]ecause GSA focused solely on

percentage discounts, it never considered that Unisys was offering far more favorable

pricing."  Id.

At oral argument, counsel for the government stated that "[t]he government does

acknowledge that [GSA] should have looked at the bottom line prices."  Hr'g Tr. 51:15-

16, June 25, 2009 ("Tr.").  However, as explained further below, the government added,

and Lockheed agrees, that "Unisys has waived its right to make that argument" by not

filing a protest before the deadline for receipt of quotations.  Id. at 51:17 to 53:2.

Unisys states that Lockheed's proposal did not offer pricing for [redacted].  Ptf.'s Mot. JAR at 3; Tr. 90:8-13.  Unisys argues that the discussions that the government held with Lockheed regarding this and related pricing issues "violated the standards for competitive proposals, as well as the provisions of the RFQ," Ptf.'s Mot. JAR at 3-4, and that they "clearly prejudiced" Unisys, id. at 20.  While Unisys argues that the decision to hold discussions only with Lockheed was arbitrary and capricious regardless of which FAR provisions apply, Unisys also asserts that "FAR Part 15 principles are implicated by the language and circumstances of this procurement," Ptf.'s Resp. to Def.'s Mot. JAR and Lockheed's Cross-Mot. for JAR ("Lockheed's Mot. JAR") ("Ptf.'s Resp.") at 18.  Specifically, Unisys claims that FAR 15.306(d)(1) and 15.306(e) should apply.[4]  Ptf.'s

_____

[4]FAR 15.306(d) provides, in pertinent part:

(d) Exchanges with offerors after establishment of the competitive range. Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

(1) Discussions are tailored to each offeror's proposal, and must be conducted by the [CO] with each offeror within the competitive range.

48 C.F.R. § 15.306(d) (2005).

FAR 15.306(e) provides, in pertinent part, that "Government personnel involved in the acquisition shall not engage in conduct that . . . [f]avors one offeror over another[.]"  48 C.F.R. § 15.306(e) (2005).

14

Mot. JAR at 22. Therefore, argues Unisys, this court should apply FAR Part 15 principles

regarding discussions held with offerors, hold that the discussions were illegal thereunder,

and set aside the procurement.  Ptf.'s Resp. at 18 (citing <u>Sys. Plus, Inc. v. United States</u>, 68

Fed. Cl. 206, 211 (2005)).

     In response, the government and Lockheed assert that GSA's communications with

Lockheed were not improper under FAR 8.404(a).  <u>See</u> Lockheed's Mot. JAR at 29.  FAR

8.404(a) states, "Parts 13 . . . , 14, <u>15</u>, and 19 . . . do not apply to BPAs or orders placed

against [FSS] contracts . . . . BPAs and orders placed against a [Multiple Award

Schedule], using the procedures in this subpart, are considered to be issued using full and

open competition . . . ."  48 C.F.R. § 8.404(a) (emphasis added).  Therefore, argue

Lockheed and the government, the prohibitions on such discussions contained in FAR Part

15 do not apply to procurements conducted pursuant to FAR 8.4, such as the procurement

at issue here.  Lockheed and the government argue that GSA's conduct as regards the

discussions with Lockheed was rational, reasonable, and permissible under applicable law.

     Finally, Unisys argues that GSA's technical evaluation of Unisys was arbitrary and

inconsistent with the evaluation criteria.  Unisys claims that the weaknesses it was

assigned are "disproved by reference to Unisys'[s] proposal," Ptf.'s Mot. JAR at 23, 31,

and that "[h]ad the technical evaluation been done correctly, Unisys should have received

the same or better rankings as Lockheed for the non-price factors."  <u>Id.</u> at 4.  The

government and Lockheed counter that the evaluations were properly conducted, and that

the court should defer to the discretionary determinations of the TEB.  The parties'

arguments regarding the specifics of the technical evaluations are discussed in more detail

below.

2.        Lockheed's Motion to Dismiss

Lockheed argues that pursuant to Blue & Gold Fleet, L.P. v. United States, 492

F.3d 1308, 1313 (Fed. Cir. 2007), challenges to the terms of a solicitation must be raised

in the Court of Federal Claims before the closing date for receipt of proposals.  Because

"Unisys asks the Court to review the propriety of [a price] evaluation methodology that

was explicitly described in the RFQ[,] which Unisys consciously elected not to protest

prior to submission of its proposal," Lockheed argues that Unisys's claims regarding the

pricing of its bid constitute a challenge to the terms of the solicitation, and therefore

should have been raised before the deadline for proposals.  Mot. Dismiss at 2.

Lockheed points to the following language of the RFQ as being that which Unisys

is now challenging:

> Evaluation of Pricing shall be based upon the proposed single, minimum
> "team" discount (expressed as a percentage) which shall be applicable to all
> labor categories, labor rates, and support products contained in the BPA
> [Special Item Numbers] of each team member's GSA Schedule contract.
> [. . .]
> For price evaluation purposes, the Government will simply compare the
> minimum "team" discount percentage proposed, and will not apply the
> proposed discount to any of the underlying labor rates/support products
> contained in any of the proposed GSA Schedule contracts.  Given this analysis,
> a team percentage discount of 10% will be evaluated more favorably than a
> discount of 5%, regardless of the underlying labor rates and/or support product
> prices resident in the proposed GSA Schedule contracts.

16

AR 1145 (RFQ Section 12.2); <u>see</u> Mot. Dismiss at 2; <u>see also</u> Compl. ¶ 18.

In response, Unisys states that "the timeliness of Unisys's challenge to GSA's failure to consider price in the award decision . . . rests on the proper interpretation of the RFQ." Opp'n to Mot. Dismiss at 2. It asserts that the RFQ, taken as a whole, required GSA to consider not only the percentage discount offered by each contractor, but also the bottom-line prices that these discounts would yield. <u>Id.</u> at 2-3. Unisys argues that the above-quoted RFQ Section 12.2 must be read in conjunction with RFQ Section 12.1, which states, in pertinent part, "The BPA will be awarded to the offeror whose quotes provide the best value to the Government, price and other factors considered." <u>Id.</u> at 3 (quoting AR 1144). Unisys argues that "price" has a meaning separate and distinct from "percentage discount," and that it understood that both the bottom-line prices and the percentage discounts would be considered. Additionally, Unisys points to RFQ Sections 11.7(b) and (c), which laid out the requirements for two sections of the written price quote. RFQ Section 11.7(b) outlines requirements for a section to be included in the price quotes and labeled "Tab B." AR 1137. It states, "The offeror shall indicate the price to be charged for all labor categories in Section 1.3.2[5] commensurate with its GSA pricing, as discounted on the BPA." <u>Id.</u> RFQ Section 11.7(c), which outlines requirements for a section to be included in the price quotes that was to be entitled "Tab C," states:

The information requested in the quote is required to enable the Government

---

[5]RFQ Section 1.3.2 required contractors to specify the "labor mix," or combination of different classifications of employees, that it proposed to utilize under the BPA. AR 1040.

to perform a price analysis.  The offeror shall prepare one summary schedule (identified in Tab B) which provides the labor categories and rates commensurate with its GSA pricing and the GSA pricing of any teaming partners to include any discounts proposed for the purpose of the BPA.

Id.

Unisys argues that in its motion to dismiss, Lockheed miscategorized Unisys's position in stating that Unisys takes issue with the above-quoted RFQ Section 12.2. Rather, Unisys explains that its argument regards "[t]he other provisions of the RFQ . . . [which] state that GSA will consider price in making the award and will perform a price analysis of the prices for all labor categories."  Oppn. to Mot. Dismiss at 4.  In other words, Unisys argues that it understood that a comparison of the percentage discounts would be part of GSA's evaluation process, but it believed, based on language contained in other sections of the RFQ, that a comparison of bottom-line prices would also be considered.  While Unisys concedes that it understood "that GSA's evaluation of percentage discounts would likely be detrimental to its position," it "decided not to protest because Unisys was confident that its price would be more favorable and ultimately would carry the day."  Id. at 4.

## STANDARDS OF REVIEW

## I.    Standard for Procurement Challenges

The United States Court of Federal Claims has jurisdiction to adjudicate pre- and post-award bid protest claims pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000), which provides this court with

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement[,] . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1); see also, e.g., Impresa Construzioni Geom. Domenici Garufi v. United States, 238 F.3d 1324, 1330 (Fed. Cir. 2001).  The Federal Circuit has held that "the proper standard to be applied in bid protest cases is provided by [the Administrative Procedure Act ('APA'),] 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A); citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); 28 U.S.C. § 1491(b)(4) (2000). Under APA standards, a procurement decision "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332.  If the challenge is "based on alleged violations of 'regulation or procedure,' a claimant must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330-31 (Fed. Cir. 2004) (quoting Banknote, 365 F.3d at 1351).  To establish prejudice, a protester "must show that there was a 'substantial chance' it would have received the contract award but for the errors" alleged. Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citing Info. Tech. &

Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003); Alfa Laval

Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

## II.    Standard for Motion to Dismiss Pursuant to RCFC 12(b)(6)

In ruling on a motion to dismiss, whether for lack of subject matter jurisdiction

under RCFC 12(b)(1) or for failure to state a claim upon which relief may be granted

under RCFC 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above

the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)

(internal citations omitted); Bank of Guam v. United States, --- F.3d ----, 2009 WL

2448503 at *6 (2009) ("In order to avoid dismissal for failure to state a claim, the

complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing

of entitlement to relief." (quoting Twombly, 550 U.S. at 557)); Ashcroft v. Iqbal, --- U.S.

----, 129 S.Ct. 1937, 1949 (2009) (explaining that the standard articulated in Twombly "is

not akin to a probability requirement, but it asks for more than a sheer possibility that a

defendant has acted unlawfully" (citation and internal quotation marks removed)).  In

considering a motion under RCFC 12(b)(6) for failure to state a claim upon which relief

can be granted, "[t]he court must determine 'whether the claimant is entitled to offer

evidence to support the claims,' not whether the claimant will ultimately prevail."

Chapman Law Firm Co. v. Greenleaf Const. Co., 490 F.3d 934, 938 (Fed. Cir. 2007)

(quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  "In doing so, the court 'must

accept as true all factual allegations in the complaint[] and . . . indulge all reasonable inferences in favor of the non-movant.'" Id. (quoting Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001)); see also Levine v. United States, 453 F.3d 1348, 1350 (Fed. Cir. 2006) (the court must draw "all well-pleaded factual inferences in favor of the complainant").  Moreover, "'[u]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,' the complaint should not be dismissed." Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); see also United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327 (Fed. Cir. 2006) (a 12(b)(6) motion "is appropriate when the facts asserted by the plaintiff do not entitle him to a legal remedy").  Thus, "[a] dismissal for failure to state a claim . . . is a decision on the merits which focuses on whether the complaint contains allegations, that, if proven, are sufficient to entitle a party to relief." Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995).

## DISCUSSION

**I.      Unisys's Price-Related Claims Must Be Dismissed Pursuant to RCFC 12(b)(6).**

In Blue & Gold Fleet, the incumbent on a contract with the United States to provide ferry service, ticket sales, and other concessions for visitors to Alcatraz contested the award of a new contract for these services to another offeror, Hornblower. Blue & Gold Fleet, 492 F.3d 1308.  The plaintiff argued that the government should have applied the Service Contract Act, 41 U.S.C. §§ 351-358 (1976), to the solicitation, and found

21

accordingly that Hornblower's proposal was not financially viable because it failed to take into account the wages and benefits required of a contractor to be paid to its employees under the Service Contract Act.  Blue & Gold Fleet, 492 F.3d at 1312.  The Federal Circuit held that although the plaintiff characterized this as a challenge to the evaluation of Hornblower's proposal, "this argument [was] properly characterized as a challenge to the terms of the solicitation."  Id. at 1313.  Under Blue & Gold Fleet, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  Id. Holding that such was the case with Blue & Gold Fleet's protest, the Federal Circuit determined that the plaintiff's objections to the failure to include the Service Contract Act's requirements in the solicitation were waived because they were not timely filed.  Id. at 1316.

This court finds that Unisys's price-related claims are barred by the Federal Circuit's holding in Blue & Gold Fleet because the alleged error of which the plaintiff complains was clear before the deadline for the receipt of quotes.  Accordingly, Unisys has waived its right to protest the price evaluation methods contained in the RFQ, and these claims must be dismissed pursuant to RCFC 12(b)(6).

RFQ Section 12.2 clearly stated, in pertinent part,

Evaluation of Pricing shall be based upon the proposed single, minimum "team" discount (expressed as a percentage) which shall be applicable to all

22

> labor categories, labor rates, and support products contained in the BPA
> [Special Item Numbers] of each team member's GSA Schedule contract.
>
> [. . .]
>
> For price evaluation purposes, the Government will simply compare the
> minimum "team" discount percentage proposed, and will not apply the
> proposed discount to any of the underlying labor rates/support products
> contained in any of the proposed GSA Schedule contracts. Given this analysis,
> a team percentage discount of 10% will be evaluated more favorably than a
> discount of 5%, regardless of the underlying labor rates and/or support product
> prices resident in the proposed GSA Schedule contracts.

AR 1145 (emphasis added).  Recognizing that this provision, "which indicated that GSA

intended to reward an offeror for offering the highest percentage discount regardless of

what that meant for the resulting prices . . . made little sense," Ptf.'s Mot. JAR at 7, Unisys

posed the following question, which GSA included and answered in Amendment 2 to the

RFQ:

> Evaluation of pricing based on the team discount without applying the discount
> to any of the underlying labor rates/products does not appear to offer best value
> to the buyer, GSA.  For example if contractor A has a program manager rate of
> $200 per hour and offerors a 15% discount, the price to the buyer would be
> $170 per hour.  If contractor B has a program manager rate of $100 per hour
> and offers a 10% discount, the price to the buyer would be $90 per hour, a
> much better deal for the buyer.  However, evaluating only based on the discount
> rate would mean contractor A is evaluated higher than contractor B.  Applying
> the discount rate to labor rates and products and evaluating the cost at that point
> would appear to give a truer picture of the best value to the buyer.  Please
> comment.

AR 1157 (emphasis added throughout).  GSA replied, "The rates by labor category are not

consistent across the schedules.  The Government will maintain the current wording of the

solicitation." Id.

Unisys's question demonstrates that it was aware of the alleged error in the

23

solicitation in advance of the closing date of the RFQ.  Although Unisys now attempts to

argue that it understood RFQ Sections 11.7(b), 11.7(c), and 12.1 to mean that GSA would

compare bottom-line prices _in addition to_ the percentage discounts, this argument is

unavailing.  At the very least, Unisys should have realized that the language of RFQ

Section 12.2 did not comport with this understanding, and its arguments to the contrary

strain credulity.

Firstly, the organization of RFQ Section 12 clearly indicates that Section 12.2,

entitled "Price Quote Evaluation," is the primary section controlling price evaluation.

RFQ Section 12 is organized as follows:

| | |
|---|---|
| 12.1 | Method of Award |
| 12.2 | Price Quote Evaluation |
| 12.3 | Technical Evaluation Factors |
| 12.3.1 | Factor 1 - Key Personnel and Project Staffing Approach |
| 12.3.2 | Factor 2 - Technical Approach |
| 12.3.3 | Factor 3 - Management Approach |
| 12.3.5[6] | Assumptions |

AR 1144-47.

The first section, 12.1, entitled "Method of Award," outlines the overarching

structure of the award determination.  It provides, in pertinent part, "The BPA will be

awarded to the offeror whose quotes provide the best value to the Government, price and

other factors considered.  Technical quotes will be evaluated based on the factors

described in 12.3 below. . . . All three technical factors are significantly more important

_____

[6]The solicitation did not include a Section 12.3.4.  AR 1146-47.

than cost." Id. at 1144.  The language of this section, taken in conjunction with the

organization of RFQ Section 12, implies that the price evaluation shall be primarily

controlled by the terms of RFQ Section 12.2.  Put another way, RFQ Section 12 contains

three subsections, the first of which describes, in pertinent part, how GSA will weigh price

in relation to technical factors in making its final determination, the second of which

describes the factors used in evaluating price, and the third of which describes the

evaluation of the technical factors.  Given this internal organization, it should have been

clear to all involved that RFQ Section 12.2, and not RFQ Sections 11.7(b) or (c), would be

controlling with regard to price evaluation.

Furthermore, this court finds nothing in RFQ Sections 11.7(b) or (c) that, in light of

the language contained in RFQ Section 12.2, could reasonably give rise to the belief that

GSA was going to look at bottom-line prices in addition to comparing percentage

discounts.  RFQ Section 11 is entitled "Instructions, Conditions, and Notices to Offerors

or Respondents."  AR 1134.  Within that larger section, RFQ Section 11.7 is entitled

"Submission of the Written Price Quote (Part I)."[7]  While it was reasonable for Unisys to

rely on RFQ Section 11.7 for instructions on how to complete the materials that would

form the basis for GSA's evaluation, it would not have been reasonable for Unisys to

believe that RFQ Section 11.7 established a method of price evaluation separate and

---

[7]As stated above, RFQ Section 11.6 indicated that the submission is to be broken into three parts, the Written Cost/Price Quote (Part I), the Written Technical Quote (Part II) and the Oral Technical Quote Presentation (Part III).  AR 1135-36.  Instructions for Parts II and II were contained in Sections 11.8 and 11.9 of the RFQ.  Id. at 1137-43.

distinct from that contained in RFQ Section 12.2, the section that clearly outlined the method that the government intended to use for price evaluation.

Unisys's question to GSA indicates that prior to the deadline for receipt of quotations, Unisys understood that GSA intended to evaluate price based solely on a comparison of the percentage discounts.  In analyzing this, it is helpful to examine the following excerpt from that question:

> Evaluation of pricing based on the team discount without applying the discount to any of the underlying labor rates/products does not appear to offer best value to the buyer, GSA.   For example if contractor A has a program manager rate of $200 per hour and offers a 15% discount, the price to the buyer would be $170 per hour.  If contractor B has a program manager rate of $100 per hour and offers a 10% discount, the price to the buyer would be $90 per hour, a much better deal for the buyer.  However, evaluating <u>only</u> based on the discount rate would mean contractor A is evaluated higher than contractor B.  Applying the discount rate to the labor rates and products and evaluating the cost at that point would appear to give a truer picture of the best value to the buyer.

AR 1157 (emphasis added).  Unisys's use of the word "only" in this passage is telling.  It indicates that Unisys comprehended that comparing the percentage discounts was to be the <u>sole</u> means of comparing prices, not one of two means.  In light of this fact, this court holds that any ambiguity or error contained in the solicitation was apparent to Unisys prior to the deadline for receipt of quotes.  Therefore, Unisys cannot demonstrate the existence of any set of facts that would raise the right to relief above a speculative level.  <u>Twombly</u>, 127 S. Ct. at 1965.  Accordingly, based on the Federal Circuit's holding in <u>Blue & Gold Fleet</u>, 492 F.3d 1308, this court must grant Lockheed's motion to dismiss.

**II.     The Government's Discussions with Lockheed Do Not Require This Court to**

26

**Set Aside the BPA.**

As stated above, Unisys argues that the discussions the government held with Lockheed were improper and prejudiced Unisys's chances of receiving the procurement. For the reasons discussed below, this court finds that GSA's discussions with Lockheed were not improper under the applicable FAR provisions and did not substantially prejudice Unisys's chances of obtaining the BPA. Accordingly, there is no reason to set aside the BPA decision on this ground.

Unisys argues that "[b]y choosing to conduct discussions with Lockheed, GSA was implicating familiar principles of competitive procurements described in FAR Part 15 that such discussions must be conducted with each offeror in the competitive range (FAR 15.306(d)(1)), and that discussions cannot favor one offeror over another (FAR 15.306(e))." Id. While Unisys acknowledges that the procurement was conducted under FAR 8.405-2 and not under FAR Part 15, it argues that

> in accordance with FAR 8.405-2(d), GSA was required to "evaluate all responses received using the evaluation criteria provided to the schedule contractors." Here, FAR Part 15 principles are implicated by the language and circumstances of this procurement. Therefore, "those portions [of the standards found in FAR Part 15] that are particularly implicated by the procedures used will be applied to the Solicitation."

Ptf.'s Resp. at 18 (citing Sys. Plus, 68 Fed. Cl. at 211 (brackets in original; internal citation removed)). In other words, Unisys argues that even though the procurement was conducted under FAR Part 8, the language of the RFQ invoked sections of FAR Part 15 that prohibit conducting discussions with only one offeror.

27

Alternatively, Unisys argues that

> it is not decisive whether FAR Part 15 principles apply, because the FAR Part 15 principles regarding discussions state what is obvious - that disparate treatment of offerors is arbitrary, capricious, and unfair, and that an agency cannot favor one offeror over another, such as by providing information only to one offeror and permitting only that offeror to submit a revised proposal in response to such information.

Ptf.'s Resp. at 18-19.

Before turning to whether the discussions violated a "fairness" standard or an arbitrary and capricious standard, this court will first address whether FAR Part 15's limitations on discussions apply to this procurement.  This court finds that they do not.

First, as the government and Lockheed note, FAR 8.404(a) provides, in pertinent part, that "[FAR] Parts 13 (except 13.202(c)(3)), 14, <u>15</u>, and 19. . . do not apply to BPAs and orders placed against [FSS] contracts. . . ." (emphasis added).  48 C.F.R. § 8.404.  The parties do not dispute that the procurement at issue is a BPA placed against an FSS contract.  However, Unisys argues that "FAR Part 15 principles are implicated by the language and circumstances of this procurement."  Ptf.'s Resp. at 18.  This court disagrees.

Simply put, the court finds no language in the procurement that could have led Unisys to reasonably believe that FAR Part 15 principles were implicated.  Unisys points to two sections of the procurement as the basis for this understanding, RFQ Section 11.2 and RFQ Section 11.9.1.  Unisys notes that RFQ Section 11.2(c) provided that GSA "may make award based on initial offers received, without discussion of such offers."  Ptf.'s Mot. JAR at 22 (quoting AR 1847).  Unisys claims that "[t]his provision advised offerors

that GSA would either not conduct discussions, in which case the award would be based only on the contents of the initially submitted proposals, or that GSA would conduct discussions with all offerors. . . ." Ptf.'s Mot. JAR at 22. With regard to RFQ Section 11.9.1, Unisys states that this section "sets out strict parameters for the conduct of oral presentations and states that 'all offerors [must be] given the same opportunity to present and answer questions.'" Ptf.'s Resp. at 18 (brackets in original).

RFQ Section 11.9 contains the instructions for and parameters of the oral technical quote presentation, which is Part III of the three-part proposal, AR 1470, (as explained above, Part I is the written cost/price quote and Part II is the written technical quote, AR 1467). RFQ Section 11.9.1, entitled "Oral Technical Quote Presentation Constraints," gives instructions for the day of the offeror's Part III oral technical quote presentation. AR 1470-71. It describes, inter alia, how much time the offeror shall have for the presentation and how the question and answer ("Q&A") session that immediately follows the presentation shall be conducted. From the three paragraphs of RFQ Section 11.9.1, Unisys provided only the following quotation: "'all offerors [must be] given the same opportunity to present and answer questions.'" Ptf.'s Resp. at 18 (brackets in original). It is worth examining this excerpt within the context of the entire paragraph from which it comes:

> Upon completion of the presentation, the Government will caucus to formulate any questions regarding the presentation. The approximate length of time the offeror can expect the Government to caucus is 30 to 60 minutes. The Government and offeror will then address any questions or clarifications posed by the [CO] or the TEB Chairman. The Q&A session is expected to last about one hour. If necessary, the offeror may briefly caucus to coordinate responses

> to specific questions or clarifications.  The [CO] and the TEB Chair will be responsible for ensuring the schedule is met and that <u>all offerors are given the same opportunity to present and answer questions</u>.  Offerors shall provide twenty (20) approximately bound hard copies of the presentation materials.  Only those slides actually presented will be considered in the technical evaluation.

AR 1471 (emphasis added).  This court cannot agree with Unisys's contention that this language somehow invokes FAR 15.306(d)(1) or 15.306(e).  As stated above, FAR 15.306(d) governs negotiations after the establishment of a competitive range in negotiated procurements, and defines negotiations as follows: "Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal."  48 C.F.R. § 15.306(d).  FAR 15.306(e) contains additional limitations on exchanges between the government and an offeror after the receipt of proposals.  48 C.F.R. § 15.306(e).  While the communications between GSA and Lockheed about which Unisys complains may be considered "negotiations" under FAR 15.306(d) were that section to apply, that is not the issue.  Rather, the issue is whether the language of RFQ Section 11.9.1 somehow invokes either of these FAR Part 15 sections.  It does not.  FAR 8.404(a) specifically states that FAR Part 15 does not apply to such procurements.  Unisys's attempt to turn this FSS procurement into a negotiated procurement under FAR Part 15 must be rejected.

However, although FAR Part 15 does not apply, the court will review GSA's actions to ensure that GSA did not violate the requirement of fundamental fairness in the procurement process by conducting discussions with Lockheed.  Under the FAR, "all

contractors and prospective contractors shall be treated fairly and impartially, but need not be treated the same."  FAR 1.102-2(c)(3), 48 C.F.R. § 102.2(c)(3) (2004).  For the reasons set forth below, the court finds that the government did not violate this standard.

Unisys's principal argument is that it was treated unfairly when GSA asked Lockheed to provide GSA with [redacted] and when GSA asked for an additional discount.  Ptf.'s Resp. at 21-24.  Unisys argues that as a result of these requests,  Lockheed was able to make its initial offer not only "acceptable" but also more attractive to the government.  Unisys argues that had it been given the same opportunity to address "weaknesses" in its proposal, it may have received the award.

While it is true that only Lockheed was given the opportunity to respond to the government's concerns, it is clear from a review of the record that GSA's discussions with Lockheed were not unfair to Unisys.  The record demonstrates that GSA conducted discussions with Lockheed because it wanted to clarify some of the assumptions Lockheed had made in responding to the RFQ and to see if it could secure a larger discount.  AR 3273-74.  The record further demonstrates, however, that GSA did not consider Lockheed's responses in the evaluation process.  [Redacted.]  Similarly, the award decision makes clear that Lockheed was chosen over Unisys based on its "initial proposal at a not to exceed ceiling of $400,000,000." AR 3278 (emphasis added).  The decision document then goes on to state that "[t]hrough . . . negotiations the Government was able to receive additional discounts."  Id.

In view of the foregoing, it is clear that GSA made its decision based on the initial [redacted]% discount that Lockheed had offered on its FSS 70 prices and on the technical evaluation Lockheed provided.  The discussions simply allowed GSA to confirm [redacted] and to gain a greater price reduction from the one Lockheed had already offered.  Importantly, these discussions were conducted in the context of the $400 million cap GSA had placed on the procurement and against the backdrop of the FSS prices, which had already been approved by GSA, as "fair and reasonable."  As such, Unisys has not demonstrated that the government's discussions with Lockheed resulted in "unfairness" to Unisys given that the award decision was based on both Lockheed's and Unisys's <u>initial</u> prices and technical proposals.

In this connection, it is important to note that even if the government were required to conduct discussions with Unisys, GSA would have never been required to discuss weaknesses in Unisys's proposal other than those branded "significant weaknesses." <u>WorldTravelService v. United States</u>, 49 Fed. Cl. 431, 439-40 (2001).  As Unisys's proposal did not have any "significant weaknesses," only less severe "weaknesses," AR 2389-93, GSA would not have been required to discuss these weaknesses with Unisys and provide the information that Unisys claims it would have needed to raise its "good" ratings to match Lockheed's "excellent" ratings.  Therefore, as discussed below, for purposes of the technical evaluation, Unisys's quote would still have been inferior to Lockheed's, and Unisys would not have been awarded the BPA for that reason.

**III.   Unisys's Technical Evaluation is Supported by the Administrative Record.**

As explained above, GSA's technical evaluations of the offerors' proposals encompassed three factors: Management Approach, Technical Approach, and Key Personnel and Project Staffing Approach.  AR 3269.  Unisys received adjectival ratings of "good" for the Management Approach and Technical Approach Factors and "excellent" for the Key Personnel and Project Staffing Approach Factors.  Id.  Lockheed received ratings of "excellent" for all three factors.  Id.  There was no rating between "good" and "excellent."  AR 3186-88, 3194-98, 3201-05.  Unisys challenges its two "good" ratings and argues that it should have received "excellent" ratings for both.  For the reasons explained below, this court finds that the ratings are supported by the administrative record.

    A.    <u>Unisys's Technical Evaluation</u>

        1.    <u>Technical Approach Factor</u>

Unisys received an "excellent" rating for the first technical factor and "good" ratings for the second and third factors.  The Consensus Report gave the following rationale for the overall rating of "good":

> <u>Unisys's technical proposal met all requirements</u>.  It mostly fulfilled the evaluation criteria in a beneficial way to the Government and <u>there were no significant weaknesses or risks</u>. [Redacted].

AR 2384 (emphasis added).

Unisys was assigned no risks or weaknesses for the first technical factor, but

several risks and weaknesses for the second and third factors.  The risks and weaknesses

for the second factor, Technical Approach, involved: (1) modernization [redacted]; (2) the

[redacted]% cost reduction (Unisys did not adequately explain how it would achieve the

reduction); (3) complexity and interrelationship of tasks [redacted]; (4) [redacted] (which

was removed from the final evaluation); (5) delivery of excellence [redacted]; (6) software

development [redacted]; and finally (7) smaller systems [redacted].  AR 2390-91.

[Redacted.]

Under the evaluation criteria set forth in the RFQ, proposals had to be "detailed"

and "complete" to receive an "excellent" rating.  AR 2363.  If not, an offeror could

receive, at best, a "good" rating.  AR 2364-65.  Additionally, proposals were evaluated as

to whether they were effective and efficient at accomplishing the government's

requirements, effective at using industry standards, and tailored to the BPA.  AR 2362-66.

[Redacted].  Given the problems identified above with Unisys's proposal, the overall

"good" rating assigned to Unisys for the Technical Approach Factor by GSA's evaluators

was not arbitrary or capricious, and did not reflect an abuse of discretion.  [Redacted].

Finally, Unisys has not provided the court with any basis for questioning GSA's exercise

of its technical expertise in finalizing its ratings.

"The evaluation of proposals for their technical excellence or quality is a process

that often requires the special expertise of the procurement officials, and thus reviewing

courts give the greatest deference possible to these determinations."  Beta Analytics Int'l,

Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (citing, e.g., E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)).  This court has previously held that challenges regarding "'the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.'"  Beta Analytics, 67 Fed. Cl. at 395 (quoting E.W. Bliss, 77 F.3d at 449).  For this reason, it is not for this court to substitute its own judgment for that of the procurement officials, as Unisys asks it to do in this case.  The TEB's evaluation required the exercise of such technical judgment and expertise.  Accordingly, it is entitled to the greatest possible deference under E.W. Bliss, 77 F.3d at 449.[8]

2.     Management Approach Factor

[Redacted.] [The TEB identified two weaknesses under this factor.]  Unisys takes issue with both of these weaknesses.

        In its Consensus Report, the TEB outlined five principal areas it examined in assigning adjectival ratings to each proposal.  AR 2366-71.  [Redacted.]  As with the Technical Approach Factor, given the support provided in the TEB for the overall "good"

---

        [8]Unisys points to instances in which there was some disagreement between the TEB evaluators about the ratings to be assigned Unisys.  See Ptf.'s Mot. JAR at 23, 25, 33-34.  However, as the government correctly points out, all evaluators eventually reached a consensus and signed off on the Consensus Report containing the weaknesses with which Unisys now takes issue.  Def.'s Mot. JAR at 24.  See AR 13768 (the "Consensus Sign Off" sheet for Unisys's technical evaluation).  It is worth noting that the Consensus Sign Off sheet included the statement "[t]he following members of the TEB . . . agree unanimously with the . . . ratings for this offeror."  Id. (emphasis added).  Because delving into the process by which each individual evaluator ultimately decided to sign off on the Consensus Report would involve an examination of the minutiae of the procurement process, this court declines to do so.  See Beta Analytics, 67 Fed. Cl. at 395 (citing E.W. Bliss, 77 F. 3d at 449).

rating assigned to Unisys for the Management Approach Factor, this court concludes that

it was not arbitrary, capricious, or an abuse of discretion for the TEB to assign this rating

to Unisys.

Contrary to Unisys's contentions, a review of the record reveals that the weaknesses

identified by the government are supported.  [Redacted].  In such circumstances, the court

has no basis for questioning the TEB's rating.

B.      Lockheed's Technical Evaluation

Finally, contrary to Unisys's contention, Lockheed's "excellent" ratings are

supported by the administrative record.  Lockheed received individual "excellent" ratings

for all three technical factors and an overall rating of "excellent."  The Consensus Report

gave the following rationale for this rating:

> Lockheed Martin's technical proposal met all requirements.  <u>It significantly
> fulfilled the evaluation criteria in a beneficial way to the Government and it had
> no significant weakness or significant risks.</u>  [Redacted].

AR 2372 (first emphasis added).  Unisys argues that it is inconsistent and arbitrary for

GSA to have assigned Unisys a "good" for the Management Approach Factor while

assigning Lockheed an "excellent" for the Key Personnel and Staffing Factor.  Ptf.'s Mot.

JAR at 34.  Unisys notes that "[a]s it did [for the Management Approach Factor] with

Unisys, GSA assigned two weaknesses to Lockheed under [the Key Personnel and

Staffing] factor.  The two weaknesses assigned to Unisys under the Management

Approach [F]actor are narrow; the weaknesses assigned to Lockheed under Key Personnel

and Staffing are more significant."[9] Id.

In response, the government states that "there is obviously more to determining an offeror's adjectival rating than just the number of weaknesses the offeror receives in a particular category . . . . [N]ot all weaknesses are equal.  Nor are all strengths equal." Def.'s Mot. JAR at 32-33.  The government also notes that the Consensus Report states that both of Lockheed's Key Personnel and Staffing Approach weaknesses could be mitigated, while the TEB found that only one of Unisys's Management Approach weaknesses could be mitigated.  Id. (see AR 2393 (Unisys's evaluation), AR 2378-79 (Lockheed's evaluation)).

As the government correctly observes, not all weaknesses are equal.  Simply tallying up the weaknesses accrued by Unisys and Lockheed and finding that the number each accrued is the same does not provide a basis for asserting that they should then have achieved the same adjectival rating.  This is all the more true where, as here, the adjectival ratings being compared are for two different factors.  On these facts, the court finds that the plaintiff has failed to meet its burden in demonstrating that the TEB's evaluation of Lockheed was not supported or rational.  Impresa, 238 F.3d at 1332.  Therefore, Unisys's claim of unfair disparate treatment must fail.

## CONCLUSION

For the foregoing reasons, Lockheed's motion to dismiss the price-related portions

---

[9][Redacted.]

of Unisys's complaint is **GRANTED**.  The government and Lockheed's motions for

judgment on the administrative record are both **GRANTED**.  The plaintiff's motion for

judgment on the administrative record is **DENIED**.  Accordingly, the Clerk of the Court is

directed to enter judgment in favor of the government.  Each party is to bear its own costs.

      **IT IS SO ORDERED**.

                                    s/Nancy B. Firestone            

                                    NANCY B. FIRESTONE

                                    Judge